And we'll give everybody just a moment to clear the courtroom if prior counsel wishes to do so and for counsel in the next case to get comfortable at the tables. Alrighty, we will begin with Mr. Lee. Mr. Lee, you have 10 minutes and you've reserved 5 for rebuttal. My name is LeBron Lee and I represent Georgia Atlas and Atlas, Illinois in regards to the litigation surrounding the hold back here in the state of Georgia. Essentially, the issue here is that on a motion, a 12B6 motion to dismiss, we were dismissed for having a lack of standing due to the fact that the CSA essentially renders marijuana and its derivatives to all be contraband. Georgia is arguably the 34th, 35th state to have gone through this process or even have started it and it is our contention that for the most part, nothing here is particularly novel or new. I think the clearest example of the direction I think this overall litigation in this line of the cases is going, the Chief Judge out of the First Circuit Court of Appeals recently put out an opinion that pretty much, I would say, tracks ours. He basically goes through and he affirms the entering of a preliminary injunction on the residency requirement in the Maine Medical Marijuana Act and much of the complaint that we filed here in Georgia was based more or less on parallels with the Maine action. So let me ask you something about that. I mean, that's basically a dormant commerce clause claim. And I wonder, it feels like it wasn't really briefed below and it wasn't really briefed that much on appeal here. And I wonder whether if we were to find that you had standing to assert that, it would make sense to remand it to the district court to address in the first instance. I think, Judge, while it would be somewhat inefficient, given how far the state of Georgia has already progressed and they've actually moved on in spite of this litigation still being pending in both the federal and the state level, the licenses have been issued and they're already really moving forward. So I think procedurally, Judge, I think we're obligated to do it that way. As much as I would love. I will tell you that one of my concerns when I looked at the allegations was they do seem somewhat threadbare as far as the allegations about. Well, I think you may have enough to have standing to address this because, you know, standing is not we don't make a determination on the merits. We have to assume that what you allege is is true when we make our standing determination. The issue that I see there is that it doesn't talk about, you know, things like how how Illinois. I'm sorry. No, no, it's me. Me. No, it's. What is the other Atlas besides the Georgia Atlas? Yeah. Right. We had an Illinois in the in the case before, and I was thinking I was confusing them, so I apologize. But anyway, it doesn't really talk about how Illinois Atlas was unable to compete what it would have done, what it would have filed, whether its application would have been different from Georgia Atlas's application. And I think it just makes it very hard for us to assess anything about it other than and frankly, it wasn't addressed below anyway and it wasn't really briefed. So I just wonder if that would be the way to go if we were to. And I'm not saying we would reach that conclusion, but if we were to reach that conclusion. Well, I think the issue was, Judge, in the lower court, there was a preoccupation with whether or not we had standing to be there at all. And so I don't think we ever even. I don't think the court even asked the state to respond to our motion for preliminary junction, the initial one or to any of our other subsequent motions. It was the 12 v. 6, and that was all we discussed in pretrial conferences or any briefing. So that is why we didn't really address it below. And if I'm being perfectly candid with you, Judge, it's one of those things where I think based on the somewhat unique factual circumstances we have in terms of how the licenses was scored and how that process was done, I do not think much will be required from us in terms of presenting factual evidence to essentially substantiate the protectionist claim and to say that the residency requirement is bad on its face. I think the case law is pretty strong. I think there are now six injunctions across the country in identical circumstances striking down essentially the residency requirement in these medical marijuana laws. And in particular, I think what makes ours even more interesting is the fact that not only was the residency requirement included in the application process, but it was then arbitrarily applied to create distinctions between the applicants in terms of their ranking. And so that's one of the more . . . Can I ask you just a question? Yes, ma'am. Because I just wanted to make sure that I understood it. On appeal, though, you're really only proceeding on counts 1, 2, and 5, right? Yes, ma'am. So 3 and 4 are not an issue in this appeal? That is correct, Judge. Okay. We were merely contesting standing. And that is really the other issue is we did not really feel it would be a meaningful use of the court's time to address an issue that we really never touched in the lower court. So that's why we focused almost exclusively on the standing issue because it was novel and we had not . . . And I understand. I mean, I'm not second-guessing that. I'm just trying to figure out what the best way for us to deal with that would be if we reached that. Right. Understood, Judge. But I guess what I would say is, you know, our biggest issue with the trial court's opinion, and essentially I think the common source of all the confusion, is that the judge over-applied the CSA and extended its breaches much further than it was intended to be applied. I think it's undisputable given Gonzalez and some of the other cases, like I said, the other injunction cases across the country, that there is no complete preemption here. And that the fact that the DOJ and its various memos and directives has essentially permitted these medical marijuana markets to exist across states, and that Congress itself has also passed an amendment to every single congressional budget since 2014, and that given that it is essentially afforded the state's ability to do this, without a clear statement to the contrary that it's going to also not allow congressional protections to apply, you just can't strip us of standing the way the trial court did. And there's nothing here to explicitly state that participants in this market would not have the normal constitutional protections in place, that we would somehow be— Can I ask you a question? What do we do, though, with the Supreme Court cases that seem to—I mean, I know that—I can't remember if this is the correct one, but Justice Thomas had written, with respect to a denial of a petition for cert, he addressed this issue. I think it's Akimbo v. United States. What do we do with the fact that we have Supreme Court cases that seem to imply that you don't have a cognizable legal interest in contraband? I think the problem goes back to, I think, that same quote that we used from a prior case right before Akimbo, where he expressed the same concerns. When the Gonzalez case was entered, I think Justice Thomas is dead on point. There was a clear mandate from the federal government that marijuana was a forbidden substance. There would be no market, no consumption, no anything. However, over the course of the 10, 12 years since Akimbo, and the case that we took his first complaint about this from, there have been a lot of changes. There's been the DOJ, the Ogden— No, and I understand that, but I guess my question is, what do we do with that because we're not the Supreme Court? And Gonzalez v. Rake hasn't been revisited, which is the reason why he wrote Akimbo, to say, I think we need to revisit it. What do we do with that? Because that seems to be very explicit language that they use. Well, I think, and I'm almost out of time on this part, I guess I would go back to the Chief Judge's opinion from the first. He does a good job of going through and sort of highlighting that there's been a clear change and shift in the circumstances that gave rise to Gonzalez based on what we have now. And I think that is the basis for essentially distinguishing those lines of cases. Okay. Thank you, sir. Thank you very much. You've reserved five minutes for rebuttal, and we will hear from Mr. Stump. Okay. May it please the Court. Your Honor, my name is Jeff Stump, and with me today is Dan Walsh from the Georgia Attorney General's Office. We're here on behalf of the Appellees, the Executive Director, and a Commissioner of the Georgia Access to Medical Cannabis Commission. I'll just refer to them as the Commission as I proceed through my argument today, Your Honor. Your Honor, the issue before this Court is whether the adequate appellants have standing to assert federal claims or have failed to assert claims related to the license that authorizes the owner to engage in conduct that is clearly illegal under federal law. Here, the manufacturer dispensing of marijuana, specifically medical cannabis. Now, we're not saying that they don't have a remedy, just that their remedy is in state court and not in federal court. With respect to their due process claim, constitutional standing requires that they show an injury in fact that is the invasion of a legally protected interest. And the district court correctly held that they do not have such a legally protected interest. Counsel, let me ask you a question about that if I could. Sure. You know, it seems to me that the inquiry at the standing stage is obviously different than the inquiry at the merit stage. We don't require proof of the, we don't require proof at the standing stage. We accept as true the allegations. And it seems to me that, and obviously, no one specifically raised the issue in Raich. But, for example, in Raich, the Supreme Court never addressed standing even though it's jurisdictional and went on to address the merits of the claim there. And I wonder if you want to speak to that at all. Yeah, I'm not sure why standing wasn't addressed in a lot of those cases that we have cited as well as appellants have cited. But I do think that it makes sense to, in the first instance, make sure that you do have a cognizable injury and they simply don't. I mean, it's very clear from all those cases that you don't have any interest in marijuana. But they do have an interest in, well, look, they have an interest in a fair procedure. They have an injury in fact in that they were not able to get the fair procedure, etc. And it may turn out that when you get to the merits that the argument that you make is one that is more difficult to grapple with. But at the standing stage, it strikes me as I'm not sure that it does the trick for you. I'm just speaking for myself. Yeah, I mean, I think also you have to look at what the procedure is that they're talking about that, you know, they're entitled to a fair procedure. Again, we're talking about a procedure that leads to the issuance of a license, a procedure that involves reviewing an application that has all over it. How are you going to, you know, grow and manufacture and produce marijuana to the point of low THC oils? Yeah, but we also have the amendment, I guess the HOPE Act, which is, I think it's been a rider in every budget since 2015. And it carves out for non-prosecution medical marijuana in states where that's legal. I mean, it seems like there's enough for standing. It may or may not be the case that there's a problem on the merits, but it seems like that is enough to show that there is an injury in fact, that it is, that there's causation, and that it's redressable by the court. I mean, if the court were to require the procedures, for example, that Georgia Atlas is seeking or were to require a redo or were to, in the Commerce Clause part of it, were to strike the part of the law that requires Georgia residency, all of these things would redress the problems of which they complain. So, why don't we, why isn't there enough for standing? And then we grapple with the more difficult issue about, you know, contraband on the merits. No, I mean, I still think we go back to the same point, which is, it has already been determined to be contraband. It seems like it is almost making standing more of a paper tiger or a blunt instrument, rather than actually trying to control the docket and making sure that you have a case for controversy. I mean, it is, without a doubt, I don't think anyone can dispute, it is contraband for any purpose. I mean, even the Controlled Substances Act says you don't have a property interest in its forfeiture provision, which is in 21 United States Code 881. So, it just seems like that would be, require even more of the Court's attention than is required when you can handle it at the standing stage of the case. And so, I will go past the standing argument a little bit more, Your Honor. But I wanted to also talk about, obviously, we had other claims that were not, or other grounds for dismissal that were not addressed. And it is something that Georgia, Atlas, and Atlas, Illinois have not really addressed. And that is the fact that, with respect to due process, they did have a post-approvation remedy that they never solved. I agree with that. And they haven't complained about. I'm speaking for myself again. I'm sorry, Your Honor. I agree with that. I think, speaking for myself anyway, that there's an issue with that. And if they want to address that when they get back up, they're welcome to do so. And that's in the amended complaint. The other bidders did file protest bids afterwards. But they did not. That's correct, Your Honor. We've got very, all of those protests, or not all of them, but some of those protesters are now in Superior Court here in Georgia on appeal from that, from the hearing officer's decision in those cases. So, there was a remedy. And they just haven't done anything to avail themselves of it. Your Honor, let me move on to their equal protection argument. I think it's very interesting to look at the way that they've worded that claim in their complaint. They really haven't pled an equal protection violation. They allege two primary violations, one based on minority status and the fact that the HOPE Act requires an applicant to be a Georgia corporation. But they kind of turn those upside down. It's not really an equal protection argument at all. If you look at paragraph 56 of the complaint, they say, despite the HOPE Act specifically requiring the commission to prioritize minorities and domestic companies for licenses, the defendants actually gave greater weight and priority to companies that were not bona fide domestic corporations as evinced by the winning applications. Of the six licensed winners, at least five are clearly out-of-state entities owned by non-Georgians who are part of a multi-state conglomerate. And then when you get to paragraph 59, they say that despite the HOPE Act's mandate to the contrary, none of the winners are majority-minority owned. Only one winner appears to have meaningful minority presence in its owner management structure. And if you think about the way they awarded those so-called violations, what you're really looking at is that there are allegations that the commission didn't discriminate enough against non-domestic corporations or companies that have fewer women or minorities than Atlas. They aren't asking this court to level the playing field, which is an equal protection claim, but that you should tilt it even further in favor of them because according to the way that they view this, Georgia, Atlas is a real Georgia corporation, and it has more participation by women and minorities in its corporate structure than anyone else. Those allegations really fail to assert an equal protection claim. They were also required to assert that they were similarly situated with others who received more favorable treatment. That's known as comparators, and those comparators must be proven to face the identical in all relevant respects. But nowhere in the complaint do they allege that they are identical in all relevant respects to anyone. And this court held in Douglas Asphalt, which is 541 Federal 3rd 1269, it's a 2008 case, that their allegations that other applicants, even all other applicants, were treated differently do not state an equal protection claim. And the complaint must attempt to show in some fashion that these applicants were situated similarly to the plaintiff. And they just didn't do that in their complaint either, Your Honor. And finally, let me address kind of what Mr. Lee was getting into, the Akimbo argument and some of those others. What they have alleged, at least in the briefing, is that they have a way around the elements of standing by asking the court to conclude that the HOPE Act is an exception to the CSA by virtue of Section 903, which allows states to also criminalize controlled substances that don't conflict with the CSA. But nowhere in 903 does it say that a state can decriminalize the manufacture, distribution, or dispensing of a Schedule I drug. And the Supreme Court has already addressed this, addressed what exceptions are to the CSA, and it only found one. The case that we cite in our brief is United States v. Oakland Cannabis, buyer's cooperative. And in there, the dispensing cooperative argued that there was a medical necessity exemption to the CSA, which is very similar to what we're talking about here in the HOPE Act. And on 490, the Supreme Court rejected that argument and found that for marijuana and other drugs that have been classified as Schedule I controlled substances, there is but one express exception, and that is available only for government-approved research projects. So there is no exception for the HOPE Act under the CSA. As you indicated earlier, Your Honor, this issue, and Mr. Lee talked about it as well, this issue is well known to the Attorney General. It's also well known to Congress, but they haven't done anything to actually reschedule marijuana or decriminalize it as well. And certainly at this point, they are choosing not to enforce it as rigorously as before. But, of course, that could be changed with the stroke of a pen. It could be changed with the administration. We saw that when Attorney General Sessions was appointed. He did make it a point that he was going to start enforcing those laws. I found a Washington Post article that was printed back in January 4th of 2018 in which he said that they were going to start enforcing it. And there were lots of folks around the country, obviously in those states where they allowed medical marijuana, they were getting nervous that perhaps there was going to be a crackdown. So, that is, it's to simply point out that Congress and the Attorney General have not taken steps to change the decision in Wright or any of the other decisions that have found that it's contraband for any purpose. And with respect to the Dormant Commerce Clause, we did cite a case, Original Insurance v. Oklahoma. That's a district court case. It did have a Dormant Commerce Clause claim in there that was dismissed. And that was on a slightly different ground. It cited the former Fifth Circuit case of cartilage which says essentially that equity is not going to be used to help someone commit a crime. And so, that has been addressed by a district court. I will say this as well. The Dormant Commerce Clause issue was addressed in their motion for preliminary injunction. We did file a response to that. And in there, we showed that even if you did take this, you take out the Georgia Corporation requirement, they still don't win. They don't have enough points just from that to end up in a position where they would get a license. If there aren't any questions, Your Honor, that's all I have. And just ask that the court affirm the district court's dismissal of their complaint. Thank you, counsel. Mr. Lee, you've got five minutes. Judge, I guess the only thing I would add, and I'll sit down and shut up. I guess I would answer the question that was posed regarding why the other cases don't address the standing issue. And I think that's another red herring that has popped up throughout all of the litigation surrounding this matter. And that's that this is something other than a procurement case. Outside of the uniqueness of the item that's being sought to be procured or licensed to manufacture it, there's nothing distinguishing this from a licensing process to make chairs or to import paint or anything else. There's nothing unique or distinct about this situation other than the object of the license. And that's why in so many of the other cases, Judge, you don't have a reference to standing because it's almost understood that there's standing because it is a procurement process. The state is issuing a license to do something that it has the authority to do and that there's been a constitutional problem in the way it was handled. The other thing in regards to the administrative, the exhaustion of administrative remedies, we are raising 1983 claims, so we are not required to go through those hoops at this juncture in the process. To the extent we were to raise other claims regarding the process for awarding the licenses itself, we could do that in state court or have gone through the administrative procedures. But given what we observed in the process, it did not appear to us that that was a meaningful process to engage in for various reasons, and I won't go into any of that. But to the extent we end up fighting about that more, that is ultimately the reason for that, is that we had our suspicions that the process would not be terribly meaningful. And that's why we turned to the federal courts because in essence, Judge, and I like to say I won't beat that dead horse, there have been abnormalities throughout that appeals process that are a whole other set of claims that can be brought and argued about. But aside from that, Judge, unless there are other questions, that's all I have. Thank you, counsel. And we will be in recess. Actually, we will be adjourned. Have a wonderful weekend.